UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-190 (3) (DSD/LIB)

UNITED STATES OF AMERICA,

                                          **GOVERNMENT'S TRIAL BRIEF**
            Plaintiff,

      v.

SANDRA LEE BART,

            Defendant.


      The United States of America, by and through its attorneys, Andrew M. Luger,

United States Attorney for the District of Minnesota, and Manda M. Sertich and David

M. Maria, Assistant United States Attorneys, hereby submits its trial brief in the above

captioned case.   Included in this memorandum are a summary of the facts the

Government expects the evidence will establish at trial and briefing regarding possible

evidentiary matters.

## I.      THE CHARGES AGAINST DEFENDANT

      Sandra Lee Bart ("the Defendant") is charged with three counts of Conspiracy.

Count 1 is a conspiracy pursuant to 18 U.S.C. § 371 in which the United States alleges

that Defendant conspired with others to commit a false swearing in an immigration

matter in violation of 28 U.S.C. § 1746.   Count 2 is a conspiracy pursuant to 18 U.S.C.

§ 1349 in which the United States alleges that Defendant conspired with others to commit

fraud in foreign labor contracting in violation of 28 U.S.C. § 1351.   Count 3 is a multi-

object conspiracy pursuant to 18 U.S.C. § 1349 in which the United States alleges that

Defendant conspired with others to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

This case is set for a jury trial on Monday, August 1, 2016, at the Federal Courthouse in Minneapolis, Minnesota.  The trial is estimated to take approximately five to six days.  A pretrial conference has been set for Thursday, July 28, 2016.

## II.     ELEMENTS OF THE CHARGED OFFENSES

The crime of conspiracy to commit visa fraud, as charged in Count 1 of the Superseding Indictment, has four essential elements, which are:  *First*, between in or around 2010 and in or around May of 2015, two or more persons reached an agreement to make a false statement of a material fact in any application, affidavit, or other document required by immigration laws or regulations, or to present any application, affidavit, or other document that contains any false statement;  *Second*, the defendant voluntarily and intentionally joined in the agreement, either at the time it was first reached or at some later time while it was still in effect;  *Third*, at the time the defendant joined in the agreement, she knew the purpose of the agreement; and *Fourth*, while the agreement was in effect, a person or persons who had joined in the agreement knowingly did one or more acts for the purpose of carrying out or carrying forward the agreement.

The crime of conspiracy to commit fraud in foreign labor contracting, as charged in Count 2 of the Superseding Indictment, has two essential elements, which are:  *First*, two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to recruit, solicit, or hire a person outside of the United States for employment in the United States by means of materially false or fraudulent pretenses,

representations, or promises regarding that employment; *Second*, the defendant knew the general unlawful nature of the plan and willfully joined in it.

The crime of conspiracy to commit wire and mail fraud, as charged in Count 3 of the Superseding Indictment, has two essential elements, which are: *First*, that two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to voluntarily and intentionally defraud and to obtain money by means of material false representations or promises using an interstate wire communication and/or the mail or a private or commercial interstate carrier in an attempt to carry out some essential step in the scheme; and *Second*, that the defendant knew the general unlawful nature of the plan and willfully joined in it.

## III.    THE ANTICIPATED FACTS AT TRIAL

These charges arise from a fraudulent scheme by which Defendant recruited employers in the United States to employ workers from the Dominican Republic through the H-2A visa program ("H-2A visa workers") by means of materially false and fraudulent representations and promises to the United States government regarding the employment of those H-2A visa workers.  The evidence at trial will show that from 2010 through May of 2015, Defendant, along with her co-conspirators, including Wilian Socrate Cabrera and John Svihel of the Svihel Vegetable Farm, Inc. (the "Svihel Farm"), devised a plan to obtain money in the form of illegal fees and withholdings from H-2A visa workers and a cheap source of labor for the Svihel Farm, while filing and causing to be filed false immigration documents with the Department of Labor ("DOL") and the Department of Homeland Security ("DHS").

3

### A.  The H-2A Worker Visa Program.

H-2A visas are commonly referred to as "temporary work visas" and are issued to foreign agricultural workers to perform work in the United States.  A similar visa program, H-2B, operates for non-agricultural workers.  The H-2A visa program is administered by three government agencies:   DOL, DHS U.S. Citizenship and Immigration Services ("DHS USCIS"), and the Department of State ("DOS").  One witness from each agency will testify at trial regarding each agency's role in the H-2A visa program and the rules and goals of the program.

The H-2A visa program is intended for temporary seasonal, intermittent, one-time, or peak-load positions and, as such, these visas are generally issued for periods of no more than one year.  For an employer (petitioner) to qualify for the H-2A non-immigrant classification, thereby allowing foreign nationals (beneficiaries) to work for that employer/petitioner, the employer/petitioner is required to establish all of the following: (1) the need for the labor is temporary, meaning it is a seasonal need, a one-time need, a peak load need, or an intermittent need; (2) there is not a sufficient number of U.S. workers who are able, willing, or qualified and available to do the temporary work; and (3) the employment of H-2A workers will not adversely affect the wages and working conditions of similarly employed workers in the Unites States.

Understanding that foreign workers from developing countries with limited work opportunities would be susceptible to exploitation, and that such exploitation of foreign workers would ultimately impact the wages and working conditions of U.S. workers, the various agencies involved in regulating and implementing the H-2A and H-2B visa

4

worker programs implemented rules, set forth in the Code of Federal Regulations, to ensure such exploitation would not exist in the program.  Employers participating in the visa programs are required to pay the travel expenses (including airfare) of workers from abroad to the place of work in the United States.  Recruitment fees cannot be collected from the workers by anyone.[1]  Employers must pay a wage established by DOL.  In the H-2A program, employers are required to pay for or provide housing for the workers.  In general terms, any payments that would effectively reduce a foreign visa worker's wages, thereby providing a significant incentive for an employer to hire a foreign visa worker instead of a willing U.S. worker, are forbidden by the regulations.

In order to employ H-2A visa workers, an employer must file paperwork with both DOL and DHS.  DOL issues the employer an ETA Form 9142, which the employer completes and submits to DOL, often using a private agency or company to handle and submit the paperwork.  An employer seeking H-2A labor certification attests as part of the Application for Temporary Employment Certification (Appendix A to the ETA Form 9142) that:  (a) the employer and its attorney or agent have not sought or received payment of any kind from the employee for any activity related to obtaining the labor certification, including payment of the employer's attorney or agent fees, Application for Temporary Employment Certification, or recruitment costs (the attestation makes clear that prohibited payments for purposes of the program include wage concessions, kickbacks, bribes, tributes, in kind payments, and free labor); (b) the employer has and

---

[1] In the normal and lawful course of businesses using the H-2A and H-2B visa programs, worker recruitment firms receive a per-worker recruitment fee from the *employer*.

will contractually forbid any foreign labor contractor or recruiter from whom the employer engaged in international recruitment of H-2A workers to seek or receive payments from prospective employees; (c) the employer will comply with applicable Federal, State and local employment-related laws and regulations; and (d) the employer will pay the worker a wage that is the highest of the adverse effect wage rate in effect at the time the job order is placed as determined by DOL (the "prevailing wage").

Once the employer receives certification from the DOL, the employer then submits a Petition for Nonimmigrant Worker Form I-129 to DHS.  On the Form I-129, an employer must submit information about the employing petitioner and information about the prospective employment, including the job title, physical location of the job, and wages or salary.  The employer must sign the Form I-129, thereby certifying under penalty of perjury that the petition and the evidence submitted with it are all true and correct.

On the Supplement to Form I-129, an employer seeking H-2A labor certification must attest that:  (a) none of the H-2A workers located for hiring paid the employer, or any service or agent, any form of compensation as a condition of employment or made an agreement to pay the employer or any service or agent at a later date; and (2) the employer agrees to the conditions of H-2A employment, which include payment of any worker travel expenses from the worker's home abroad to the place of employment in the United States if the worker completes 50 percent of the work contract period.[2]

---

[2] In other words, a foreign worker may have to initially pay for his or her flight or other travel to the United States, but after completing fifty percent of the work contract, the employer must reimburse that flight and purchase the flight from the United States back to the worker's home.

Upon DHS approval of the I-129 Petition, the foreign nationals (beneficiaries) may then apply for H-2A visas with DOS at a U.S. Embassy or Consulate overseas using the electronic Form DS-160, Consular Electronic Application.  While the form does not have a place for a signature, when the foreign nationals arrive at the Embassy or consulate for the visa interviews, they submit their fingerprint and certify under penalty of perjury that all the statements in the visa applications and anything they say during the visa interviews is true to the best of their knowledge.  One of the questions on the DS-160 states, "Have you ever sought to obtain or assist others to obtain a visa, entry into the United States, or any other United States immigration benefit by fraud or willful misrepresentations or other unlawful means?"

As a part of this process, the employees pay a fee to DOS for the visa.  As previously explained, federal regulations prohibit employers, agents, attorneys, or recruiters from collecting any money from foreign nationals for fees associated with the program to include the H-2A labor certification fees, the I-129 Petition filing fee, recruitment fees, or any fees to allow the person to apply for the H-2A visa on a certain petition.  DHS can deny or revoke a petition if it learns a foreign national paid any of these fees.

## B.  The Scheme.

Defendant operates Horizon Lawn Management, Inc. ("Horizon") in Valley View, Ohio.  Horizon provides lawn care services to individuals and businesses in the Valley View area and has, over the previous eleven years, employed H-2A and H-2B visa workers.  In approximately 2008, Defendant, along with Wilian Cabrera, started a venture

7

to connect employers in the United States with Dominican workers for employment through the H-2A and H-2B visa programs.  It does not appear that the venture was ever registered as a business, but Defendant and Cabrera started identifying themselves to employer "clients" and various government agencies involved in the petition/visa process as representatives of "Labor Listo."  Defendant recruited employers in the United States to hire H-2A and H-2B visa workers from the Dominican Republic, often, as in this case, by suggesting to the employers that the Dominican H-2A visa workers would be willing to make concessions in the payments and other benefits due to the workers under the terms of the H-2A visa program.

Wilian Socrate Cabrera, a Dominican Republic national, has been a seasonal H-2B worker at Horizon since 2005.  He pleaded guilty on July 14, 2016, and is cooperating with the United States.  Cabrera is anticipated to testify that he met Defendant after his brother married a U.S. citizen who lives in Ohio.  Cabrera recruited Dominican workers to work for the employers located by Defendant.  In so doing, Cabrera collected a number of payments from the H-2A visa workers that are expressly forbidden by the terms of the H-2A visa program:   (1) a one-time recruitment fee between 19,000 and 108,000 Dominican pesos, equal to approximately U.S. $420 and $2,385, which Defendant kept for himself; (2) a $374 annual fee, which was split between Cabrera ($158) and Defendant ($216); (3) the cost of the H-2A visa workers' airfare to the United States and back home, which was, in some instances, paid by Defendant and then collected from the workers to pay back Defendant.  Cabrera will testify that while Defendant did not know about the initial recruitment fee he charged in the Dominican Republic, Defendant

8

certainly knew about the $374 fee of which she received $216 and about the collection of the airfare, which she often orchestrated.

Cabrera will testify that he met with Defendant on October 13, 2008, to discuss their joint venture.   This meeting was memorialized in handwritten notes taken by Defendant and establishes their plan for Labor Listo.  Defendant wrote a numbered list including the following items:  "3.  Costs – Pass on to applicant," and "4. Charge to applicant for Labor Listo services."[3]   The notes indicate a total charge to the worker/applicant of $500, subtracts visa costs that a worker/applicant would pay, and splits the remaining amount between Defendant and Cabrera (with $216 going to Defendant).  A few pages later in the notes, under a heading with "2010" and "Minnesota – Svihel," there is a calculation of the monthly savings that workers would have to set aside throughout the course of a season of work to live and work in the United States, send money home, pay for airfare,[4] and pay Labor Listo its "fees" for both 2010 and 2011.

Cabrera recruited workers from his hometown area in the Dominican Republic, Navarrete, to work for the employers recruited by Defendant.   In the Dominican Republic, Cabrera and the workers referred to the venture as "El Projecto" ("The

---

[3] Prior to January of 2009, DOL forbid the collection of fees from workers as an improper deduction from their established wages, but an employer, up until that time, did not have to certify that it and its agents would not collect any such fees on the documents submitted to the government agencies.

[4] The regulations always required the employer to pay the workers' airfare once the workers completed more than 50 percent of the employment contract but, again, no employer certifications to that effect existed until 2009.

Project").  In order to be placed on the El Projecto waiting list to work in the United States, Dominican applicants were required to pay Cabrera a recruitment fee between approximately 19,000 and 108,000 Dominican pesos, equal to approximately U.S. $420 and $2,385.  Cabrera will testify that Defendant did not know about this one-time fee charged to workers.

Cabrera will testify that the first H-2A visa workers worked in the United States through El Projecto for Defendant at Horizon.  As Defendant began to recruit more employers to hire the H-2A visa workers, Cabrera enlisted more workers in El Projecto.  Workers involved in El Projecto worked at Horizon, the Svihel Farm, a Kentucky landscaping firm called Tri-State Enterprises, a Florida farm called Statewide Harvesting and Hauling, a Wisconsin farm, a Missouri farm, and a North Dakota farm.

John Svihel is the owner/operator of the Svihel Farm in Foley, Minnesota.  The Svihel Farm farms and sells produce in the Foley and Twin Cities metro areas.  Svihel pleaded guilty on June 16, 2016, and is cooperating with the United States.  Svihel is anticipated to testify that Defendant pitched her services as a provider of H-2A visa workers from the Dominican Republic to Svihel in the early part of 2010.  Svihel agreed to employ four workers from the Dominican Republic at the Svihel Farm through Labor Listo for the 2010 growing and harvesting season, which runs from about May through October.

Svihel will testify that during the first year employing Dominican H-2A visa workers, Defendant lied to Svihel and told him that a charity or church in the Dominican Republic would pay for the workers' airfare for their first year working in the United

10

States.  Cabrera and other workers will testify that there was never a church or charity that paid for their airfare; rather, Defendant paid for the airfare on her credit card and made the workers pay her back for those charges, in direct violation of the terms of the H-2A worker visa program.

Svihel will testify that he was generally happy with the work performed by the four H-2A visa workers on the Farm in 2010, but in 2011, the wage of $9.75 per hour that Svihel paid the workers in 2010 was increased to $10.62 per hour.  Before the start of the 2011 season, Svihel had a phone conversation with Defendant and told Defendant the program was too expensive and he no longer wanted to employ the Dominican workers. He told Defendant he would rather pay bus fare to bring Mexican workers to the farm rather than pay airfare for the Dominican workers.

Svihel will testify that Defendant told him to withhold his decision on whether to bring the Dominican workers back in 2011 while she spoke with Cabrera.  She later called Svihel and told him that she spoke with Cabrera and Cabrera told her the Dominican workers would agree to pay Svihel wage kickbacks and airfare kickbacks if he brought them back to work.  In other words, they would pay him money back at the end of the season in cash, in an amount equivalent to the number of hours that they had worked times the difference between the prior year's rate and the prevailing rate in the current year.  This effectively made it so Svihel was paying the workers the same hourly wage that he had paid the previous year.

Cabrera will corroborate Svihel's testimony on this point.  Cabrera will testify that Defendant called him and proposed seeking a concession from the Dominican workers

11

that they would pay wage kickbacks and airfare kickbacks to Svihel. From then on, each year Cabrera communicated those "altered" terms of employment, *i.e.*, the actual rate the workers would be paid after kickbacks, to the workers after receiving the information from Defendant.

The Svihel Farm hired and employed four Dominican H-2A workers during the 2010 growing season, fourteen Dominican H-2A workers during the 2011 growing season, thirty Dominican H-2A workers during the 2012 growing season, forty-four Dominican H-2A workers during the 2013 growing season, sixty-eight Dominican H-2A workers during the 2014 growing season, and fifty-three Dominican H-2A workers during the 2015 growing season. For each year, Svihel signed both an ETA Form 9142 and Form I-129 with the certifications as set forth *supra*. Every year, the workers also submitted Form DS-160s to obtain their visas. Some of the Dominican workers will testify that Cabrera instructed them to go to a lawyer named Carlos to fill out their visa paperwork. Many of the workers do not read or write. Carlos asked the workers for their biographical information to fill in portions of the DS-160 form, but did not ask them many, if any, of the questions in Parts 3, 4, and 5 of the form. None of the workers remembered hearing the question about previously seeking or obtaining a visa by fraud, misrepresentation, or other unlawful means.

Svihel and some of the Dominican workers will testify that during the 2010 growing season and continuing through the 2013 growing season, Svihel did not pay for the workers' airfare as required by the terms of the H-2A program. In 2010 and for the inbound flight in 2011, the workers purchased their own flights (via Defendant). Then, at

the end of the 2011 growing season and continuing each year through the end of the 2013 growing season, Svihel made the workers pay him two types of cash kickbacks at the same time. First, Svihel required the workers to pay a wage kickback for every hour worked at the Svihel Farm. In 2011, the prevailing wage was $10.62, and workers were made to pay a cash kickback of $0.87 per hour worked. In 2012, the prevailing wage was $10.78, and workers were made to pay a cash kickback of $0.78 per hour worked. In 2013, the prevailing wage was $11.30, and workers were made to pay a cash kickback of $1.30 per hour worked. These amounts were determined in advance and communicated from Svihel to Defendant, from Defendant to Cabrera, and from Cabrera to the workers.

Second, Svihel required the Dominican workers to pay a cash kickback equal to the cost of their flights to and from the United States. At the end of each growing season, one of the workers who will testify, Diogenes Brito Vargas, along with another worker, Valentin Lopez, calculated the kickback amount owed by each worker based on the number of hours worked throughout the season and the amount of the airfare, told each worker what he owed, and kept track of who paid. The workers understood that if they did not pay the kickbacks they would not be invited back to the Svihel Farm the next season; they did not view the payment as optional. Svihel will testify that he had no role in calculating the amount of the payment or conveying to the workers what the kickback rate would be in any given year.

Svihel will testify that he kept the cash from the kickbacks to pay for travel, leisure activities, and ordinary expenses. Throughout the time period that the Svihel Farm employed H-2A workers, it more than doubled its operations and income.

13

Based on an anonymous tip regarding working conditions, DOL began an administrative investigation of the Svihel Farm in the summer of 2014. During interviews with workers, DOL investigators learned of the illegal fees. Because of the scrutiny resulting from the DOL investigation, Svihel did not collect any kickbacks at the end of the 2014 season.

Svihel will testify that when Defendant first learned of the DOL investigation, Defendant told him not to worry, because the workers had been instructed to withhold the information about illegal fees from U.S. government officials. Later, when she learned that workers told the DOL investigators about the illegal fees, she told Svihel during a phone call that she could send Cabrera to talk to the workers and that they should get the workers to sign a document retracting their statements to DOL. Cabrera and the workers from the Svihel Farm will corroborate this testimony, although Cabrera ultimately never traveled to the Svihel Farm because he was concerned that some of the workers were angry enough with him about the fees that they would harm him.

The co-conspirators then attempted to figure out who told the DOL the truth to retaliate against them by sending home "traitors" earlier than the other workers. Svihel and Defendant exchanged, via email, lists of workers, and then put "G"s for "Good" next to workers they didn't think told the DOL the truth and "B"s for "Bad" next to workers they thought told DOL the truth. They got information about who was "Good" or "Bad" from Cabrera. "Bad" workers, workers who told DOL the truth, were sent back to the Dominican Republic first in the 2014 season, including seasoned workers who had been working at the Svihel Farm for years and usually stayed later than all the other workers.

14

These "Good" and "Bad" worker lists were found both at the Svihel Farm and in Defendant's office in Ohio during the execution of search warrants.

At the beginning of the 2015 season, before any criminal action was taken by the Government, the co-conspirators again communicated about which workers were "Good" or "Bad" and did not bring back many of the workers who they thought cooperated with DOL.  After the 2014 growing season, Cabrera held meetings in the Dominican Republic and informed the workers that, unlike previous seasons where repeat workers were the first invited back and the last to leave, the Svihel Farm would be hiring mostly new workers for the 2015 growing season.  Indeed, the first workers invited back to the Svihel Farm for the 2015 growing season were, unlike the previous seasons, almost all new workers.  After the Government presented testimony that workers were being retaliated against at Cabrera's June 26, 2015 detention hearing, many of the repeat workers were invited back for the 2015 growing season, albeit much later in the season than previous years.  Some of the repeat workers deemed traitors, including Diogenes Brito Vargas, were not invited back at all during the 2015 growing season.

On May 28, 2015, search warrants were executed at the Svihel Farm, Defendant's home, the Horizon business office, and the home where the Dominican workers for Horizon lived.  During the execution of search warrants at Defendant's residence and business, law enforcement discovered printouts of emails from Defendant regarding the "business" of Labor Listo through an account called laborlisto@cox.net.  Three days after the execution of search warrants, law enforcement served a preservation notice in relation to the Labor Listo email account.  Law enforcement learned from the email service

15

provider that Defendant's entire account was deleted the day after the execution of the search warrant.  Many communications from this account were discovered by law enforcement either in printed form, in communications with co-conspirators (obtained via email account search warrant), or in communications with third parties.

### C. The Fraud.

From 2010 through 2015, Svihel hired a private agency called Southern Impact to organize and file the H-2A program paperwork for the Svihel Farm.  Those forms were either mailed by Southern Impact  at Svihel's instruction via FedEx or the U.S. Postal Service to DOL and DHS (mail fraud) or submitted electronically by Southern Impact at Svihel's instruction through the agencies' online portals (wire fraud).  For the 2010 through 2012 growing seasons, the ETA Forms 9142 were mailed by Southern Impact to DOL via FedEx.  For the 2013 through 2015 growing seasons, the ETA Forms 9142 were submitted by Southern Impact over the Internet to DOL through DOL's electronic iCert portal.  For the 2010 through 2013 growing seasons, the Forms I-129 were mailed by Southern Impact to DHS via FedEx.  For the 2014 and 2015 growing seasons, the Forms I-129 were mailed by Southern Impact to DHS via the U.S. Postal Service.  Lesli Downs from Southern Impact will testify about her and Defendant's roles in getting the paperwork filed via mail and wire.

For each filing made with each Government agency, Svihel made the certifications described *supra*, which he knew were fraudulent given the payment scheme.  Defendant also knew that Svihel was making these fraudulent certifications to the Government

agencies because she made these same certifications when petitioning for H-2A and H-2B workers for her own business, Horizon.

### D. The Payments to Defendant.

As discussed *supra*, Defendant received an annual $216 payment from each Dominican working in the United States and, in many instances, charged airfare on her credit card and received reimbursement from the Dominican workers. Cabrera will testify that he typically collected the $216 and airfare payments from the workers in cash in the Dominican Republic, including workers from the Svihel Farm, Tri-State (KY), and Statewide Harvesting and Hauling (FL). He then distributed the cash to himself and the other seven Dominican workers who worked for Defendant at Horizon. Cabrera kept track of how much each Horizon worker was paid that was due to Defendant and told Defendant how much each worker owed. Then, when the workers were working for Defendant in Ohio at Horizon, Defendant would deduct the fees from their paychecks. In other instances, Defendant would deduct her $216 share and airfare reimbursements from the Horizon workers, and the workers would then seek reimbursement from Cabrera.

This money laundering scheme is borne out in Defendant's Horizon payroll records. Numerous payroll registers for the Horizon workers show deductions for items like "MN Airfare" or in amounts evenly divisible by $216. Cabrera will describe one document, a page of notes, written by both him and Defendant and discovered in his living space in Ohio, which calculates the payments due and deductions owed by each Horizon worker for the payments they received for other workers' $216 payments and

airfare during two pay periods in 2014. The deductions calculated in the notes are reflected in the corresponding payroll registers for that time period.

One of Defendant's former Horizon employees, Hansel Amarante Vargas, is anticipated to testify at trial. Amarante Vargas will testify that he quit working for Defendant in part because of the many deductions she took from their paychecks. He will corroborate Cabrera's testimony regarding the filtering of money from Svihel Farm workers, through the Horizon workers, to Sandra Bart. His payroll registers, which he kept and which were discovered in Defendant's office, show deductions from his paychecks as he described, including on $216 deduction for, as handwritten by Defendant, "One Minn. Man."

## IV.   ANTICIPATED EVIDENTIARY AND LEGAL ISSUES DURING TRIAL.

### A. 404(b) *versus* Intrinsic Evidence.

On July 5, 2016, the Government provided defense counsel with notice of its intent to introduce evidence pursuant to Rule 404(b). Specifically, the Government seeks to introduce evidence that on prior occasions Defendant proposed to employers other than John Svihel and the Svihel Vegetable Farm, Inc. terms of employment for Dominican H-2A and H-2B employees that violated the terms of the H-2A and H-2B programs. Relatedly, the Government will seek to introduce evidence that Defendant made false representations to the U.S. Government regarding those terms of employment. After receiving additional information from Cabrera as a part of his cooperation with the Government, on July 13 and 19, 2016, the Government provided notice to defense counsel that, upon further consideration, much of this noticed 404(b) evidence is actually

18

evidence that is intrinsic to and inextricably intertwined with the charged crimes. The Government also provided notice to defense counsel that it intends to seek to admit evidence that Defendant committed fraud on her own paperwork with the Government in order to employ H-2A workers at her business, Horizon.

While the evidence is summarized and briefed in detail below, admitting this evidence would not add a significant amount of time to the trial and will not require calling any additional witnesses. The Government may seek to enter approximately ten additional documents through existing witnesses, and the testimony on those documents would only be a few minutes per exhibit.

On numerous occasions, Defendant represented to employers that travel costs for the workers would be covered for the first year they hired the Dominican workers, saving the employer money:

- In a September 15, 2010 email, Defendant represented to an H-2A paperwork processor that his "clients" – employers – would not be charged for airfare and travel for employees from the Dominican Republic.

- In a January 31, 2011 email to an H-2A/B document preparer, Defendant stated that a "church/brotherhood in the DR" assists with plane fares.

- In notes that appear to relate to Tri-State and appear to be from 2011, Defendant indicated that Tri-State workers would pay their own airfare in a cash refund.

- In a March 22, 2012 email to Lesli Downs of Southern Impact,[5] Defendant confirmed that she told an employer she would "cover" workers' travel expenses both ways.

---

[5] As previously noted, Lesli Downs will already be testifying about the filing of the fraudulent paperwork as charged in Counts 1, 2, and 3 of the Superseding Indictment and Defendant's role in that process.

- In an April 7, 2012 email to Statewide Harvesting and Hauling, Defendant confirmed that the workers' plane tickets and other expenses would be covered by a church for the initial year.

In direct contradiction to these communications, on March 9, 2010, Defendant emailed a DOS employee to promote Labor Listo's recruitment efforts and, in particular, workers who would soon have Embassy interviews to work at Tri-State. Defendant wrote, "We hope that because of our excellent record of all men returning to the Dominican Republic and the fact that this employer has been certified and is paying for plane fare to the United States and back to the DR, that all named to appear for work visas will be approved." This email makes clear that Defendant knew the employers were required to pay the workers' airfare but proposed otherwise to the employers.

Other evidence shows Defendant accounting for the money she is owed by the workers for airfare:

- On numerous payroll summaries, Defendant deducts money from her Horizon employees' paychecks for "KY airfare" and "FL airfare."

- With respect to Dominican workers in Missouri, Defendant printed an air travel itinerary for those workers, and handwrote on the itinerary "each pay $347.79."

On other occasions, Defendant used the H-2A program requirement that employers pay for housing as a bargaining chip to save employers money and induce them to hire the Dominican workers.

- With her own business, Horizon, Defendant hired H-2A workers in 2009 and 2010. Cabrera will testify that in 2010, Defendant told the workers she would move them from their usual, free housing in a home Defendant owned to apartment housing. Defendant told the workers she would pay for the apartment housing but would start charging the workers to stay in the housing where they'd lived for four years. She induced them to stay in

her house and pay by telling them that their belongings would be less safe in the apartment housing. She then sent a fax to her document preparer, Tish Sowards at KT Labor,[6] indicating that the workers wanted to live in a neighborhood where they had friends and were willing to pay for it, thereby releasing her of her duty to pay for housing. Cabrera will testify that she then asked him to get all of the men to sign a contract stating that they knew they could move elsewhere for free but were willing to pay to remain in their current housing. Both the fax and the contract were discovered during the execution of the search warrant at Defendant's office. The Horizon workers were required to make bi-weekly rent payments, deducted by Defendant from their paychecks, from that point forward.

- Handwritten notes discovered in Defendant's office indicate that in 2011 Defendant proposed to Tri-State that Tri-State could get a cash refund on airfare and that the workers will pay their own rent (saving the employer $100 per person per month). Cabrera will testify that Defendant then drafted a contract similar to the contract he signed for housing in Ohio for the workers for Tri-State and asked Cabrera to translate the contract to Spanish and present it to the Tri-State workers for their signatures. A copy of the translated contract, unexecuted, was discovered during the execution of the search warrant at Defendant's office.

Finally, Defendant flouted the rules of the H-2A and H-2B visa programs with respect to her own Dominican employees.

- In 2009 and 2010, Defendant applied to employ and did employ H-2A (agricultural) workers at 7777 Wall Street in Valley View, Ohio, when, in fact, no agricultural work was performed by the workers at that address or anywhere else. During those years, the available H-2B visas nationwide were used up very quickly in the year, so Defendant lied to be able to hire H-2A workers to perform non-agricultural work.

- Defendant lied to the Internal Revenue Service by deducting the "business expense" of her workers' airfare on her taxes for a number of years, when, in fact, during those years, the workers paid their own airfare. Defendant's notes relating to her tax returns indicate that she knew she was required to pay for the flights pursuant to Government regulations.

---

[6] Tish Sowards will be a witness at trial to testify about Defendant's knowledge of the terms of the H-2A and H-2B visa programs regardless of whether she testifies regarding the housing issue.

1.   The Intrinsic Evidence.

Given recent information provided by Cabrera and corroborated by Defendant's payroll summaries, it is clear that evidence relating to Defendant's collection of illegal fees from El Projecto workers with employers other than the Svihel Farm and evidence that she hired El Projecto workers for her own business are intrinsic to the charged offenses.

In *United States v. Kieffer*, 621 F.3d 825 (8th Cir. 2010), the defendant was an attorney-impersonator who misled numerous federal courts into admitting him to practice law in a number of jurisdictions.  In 2007, after obtaining admission to the bars of the District of Minnesota and the Ninth Circuit, the defendant made fraudulent representations regarding his background in order to be admitted to practice in the District of North Dakota.  *Id.* at 828-829.  He then used the fact that he was admitted to practice in North Dakota to gain admission to the bars of the Fourth Circuit, the District of Colorado, the Western District of Missouri, and the Eighth Circuit.  *Id.* at 829 – 30. Defendant was indicted in the District of North Dakota for mail fraud and false statements.  *Id.* at 830.  In a motion in limine, the defendant asked the district court to exclude evidence of "any . . . alleged . . . acts, which did not take place in the District of North Dakota," as admission of any such evidence would violate Rule 404(b).  *Id.* at 831.

The Eighth Circuit held that the district court did not abuse its discretion in admitting the evidence of the defendant's actions in other jurisdictions.  *Id.*  In so holding, the Court noted that the defendant's fraudulent scheme was national in its scope

and involved the deception of lawyers and courts in various jurisdictions under false pretenses. *Id.*

Here, Defendant's scheme was similarly national in scope. Her business plan with Cabrera intended to recruit as many employers from across the country to hire H-2A and H-2B visa workers from the Dominican Republic. She started by lying to employers about a charity that would pay for the workers' flights to induce them to "try out" the Dominican workers. Then, when employers found the program too expensive, she would induce them by decreasing their costs – at the expense of the workers and in violation of the programs and certifications made by the employers.

Further, Defendant's extra-jurisdictional, uncharged conduct is more inextricably intertwined than the conduct in the *Kieffer* case because: (1) the Labor Listo plan first devised by Defendant and Cabrera was not limited to the Svihel Farm; (2) the Dominican workers employed at the Svihel Farm and each of the other employers were recruited as part of the same "El Projecto" by the same co-conspirator, Cabrera; (3) the Dominican workers employed at the Svihel Farm and the Dominican workers employed elsewhere all paid the same illegal fees to Defendant ($216 plus airfare); (4) the illegal fees from the Dominican workers to Defendant were all filtered through her Dominican employees at Horizon, and in many instances it is impossible in the payroll summaries to tell which workers' fees are being deducted from the Horizon workers' paychecks; and (5) rather than being separate bad acts, these acts occurred simultaneous to the charged conduct as a part of the same overall scheme.

Evidence that Defendant applied for and hired El Projecto workers to work at her own business, Horizon, is intrinsic to the charged offense because those workers were used to launder the illegal fees from the Svihel Farm workers through the Horizon workers to Defendant.  Often, in the documentation relating to the filtering of such money, it is impossible to tell whether deductions made from the Horizon workers' paychecks were for Svihel Farm workers or other workers.

The interrelatedness of the evidence is also exemplified by the fact that the Government will not be required to call any additional witnesses in order to present that evidence.  The same actors involved in the scheme to bring the workers to the Svihel Farm through illegal fees were involved in the scheme to bring workers to other employers through illegal fees.  Defendant's own statements, discovered during the execution of search warrants, can be presented through Government agents already testifying on other issues.

Evidence that Defendant collected illegal fees from El Projecto workers other than the Svihel Farm workers and evidence that she applied for and hired El Projecto workers for Horizon is admissible to "complete the story" or to provide a "total picture" of the charged crimes and is, therefore, intrinsic evidence, the admissibility of which is not covered by Rule 404(b).  *United States v. Johnson*, 463 F.3d 803, 808 (8th Cir. 2006) (*quoting United States v. Forcelle*, 86 F.3d 838, 842 (8th Cir. 1996).  Consequently, it should be admitted as evidence that is intrinsic to and inextricably intertwined with the charged offenses.

2. 404(b) Evidence.

Even if the Court rules that evidence of Defendant's illegal proposals to other employers is not intrinsic to or inextricable intertwined with the crimes charged, it should be admitted as 404(b) evidence.  The Eighth Circuit has repeatedly indicated that it regards Federal Rule of Evidence 404(b) as a rule of inclusion, "precluding only evidence that is relevant solely to the defendant's character." *United States v. Jones*, 990 F.2d 1047, 1050 (8th Cir. 1993), *cert. denied*, 510 U.S. 1048 (1994).   This kind of evidence is admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).   Further, where knowledge is an element of the crimes charged, evidence of other acts tending to establish that element is generally admissible.  *United States v. Halk*, 634 F.3d 482, 487 (8th Cir. 2011).  Evidence of other crimes, wrongs, or acts is therefore admissible under Rule 404(b) if it is:  (1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than prejudicial effect; and (4) similar in kind and close in time to the crime charged.  *Id.*  Here all elements for admissibility are satisfied.

The evidence as described above clearly demonstrates Defendant's knowledge of the illegal payments (as well as the illegality of the payments), Defendant's intent to commit these acts in violation of the law and the clear requirements of the visa programs, Defendant's motive of deriving personal profit from the workers (regardless of the location where they were employed), and the absence of mistake in collecting illegal fees from the members of El Projecto.  The evidence will be proven by a preponderance of evidence using documents written by Defendant herself and witnesses with whom she

communicated. The acts Defendant committed were not only close in time, but simultaneous to, the acts charged in the Superseding Indictment. Finally, the proffered evidence's probative value exceeds its prejudicial effect.

The evidence regarding housing costs, Defendant's representations that Horizon was involved in agricultural work, and the fact that Defendant deducted her workers' airfare expenses on her taxes even though she collected that money from the workers are admissible as 404(b) evidence for the same reasons. The documents similarly prove that Defendant had the intent to violate the terms of the H-2A visa program to her own benefit and that she did not collect illegal fees by mistake. The evidence is, therefore, relevant to multiple material facts and issues beyond Defendant's character.

For all of these reasons, the evidence, to the extent it is not intrinsic to or inextricably intertwined with the charges in the Superseding Indictment, should be admitted pursuant to Rule 404(b).

### B. Prior Statements.

The Government intends to present testimony that some of its worker witnesses and other workers were interviewed by DOL and other agency investigators in 2014. The Government does not intend to elicit testimony regarding the content of those statements as "prior consistent statements," but intends to elicit the fact that the interviews occurred. Without testimony that the interviews occurred, much of the other relevant testimony in this case – most importantly, the retaliation against workers who Defendant and her coconspirators believed told the DOL the truth about the illegal fees collected from them – would not make sense.

### C.  Custodial Witness.

Wilian Cabrera is currently detained pending sentencing in connection with this criminal case.  He has been subpoenaed to testify and is detained at Sherburne County Jail.  He will need to be transported to the Courthouse in custody, which will require coordination between the government, the USMS, and the Court.

### D.  Foundation, authentication and hearsay.

On July 13, 2016, prosecutors and defense counsel met and conferred regarding issues pertaining to foundation and authentication.  The parties have agreed that no certification will be needed to admit Government-filed documents without a witness (in other words, any 9142 or I-129 forms for Horizon or the Svihel Farm or DS-160 forms for Horizon or Svihel Farm employees).  The parties also agreed that no authentication witness from internet service providers will be required for documents obtained through the execution of email search warrants.  This will significantly expedite the trial.  Defense counsel retains their right to make objections to specific documents based on hearsay, relevance, etc.

### E.  Agency Testimony.

The Government informed defense counsel that it did not intend to call any expert witnesses, but, out of an abundance of caution, the Government provided notice that it plans to call particular Government agency witnesses to provide testimony regarding the function, goals, processes, and rules of the H-2A and H-2B visa programs.  Such

testimony is offered not as "expert" testimony, but rather direct knowledge of these witnesses' knowledge based on their own familiarity with the programs.

Dated:  July 25, 2016

Respectfully Submitted,

ANDREW M. LUGER
United States Attorney

*/s Manda M. Sertich*

BY:  MANDA M. SERTICH
Assistant U.S. Attorney
Attorney Id No. 4289039

DAVID M. MARIA
Assistant U.S. Attorney